**William Leon LILE, Jr. and Andre J. LeBlanc, Plaintiffs,**

v.

**TIPPECANOE COUNTY JAIL, Dave Heath, Sheriff, Lt. Steve Grant, Bill Balser, John Ricks, Doug Caldwell, Vince Andrews, Gary Dowell, Bret Stump, John Robbins, and Jack Hahn, Defendants.**

**Civ. No. L90–11(AS).**

United States District Court,
N.D. Indiana,
LaFayette Division.

Feb. 28, 1992.

William Leon Lile, Jr., pro se.

Andre J. LeBlanc, pro se.

Lawrence B. O'Connell, James A. Gothard, Gothard & O'Connell, Lafayette, IN, for defendants.

### ORDER

ALLEN SHARP, District Judge.

On January 7, 1992, United States Magistrate/Judge Robin D. Pierce filed his Report and Recommendation which was served on all parties and counsel appropriately. No objections have been filed thereto and the time for the same has now expired.

This court is thoroughly familiar with the record in this case which has now been pending since March 5, 1990, and 64 entries have been made on the docket sheet. Magistrate/Judge Pierce is to be complimented for the careful, thorough and correct manner of dealing with the claims in this case. These plaintiffs are pretrial detainees within the meaning of *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

With regard to the suicide attempt by a fellow inmate, a recent decision is instructive. *See Leffler v. Meer,* 936 F.2d 981 (7th Cir. 1991). *Martin v. Tyson,* 845 F.2d 1451 (7th Cir.), *cert. denied,* 488 U.S. 863, 109 S.Ct. 162, 102 L.Ed.2d 133 (1988), is also highly instructive. *See also Salazar v. Chicago,* 940 F.2d 233, 240 (7th Cir.1991). In the last analysis, the most important concept involved is the evolutionary one of deliberate indifference, tracing its origins back at least to *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). This court dealt with that subject in an evidentiary context in *Musgrove v. Broglin,* 651 F.Supp. 769 (N.D.Ind.1986), and *Burris v. Kirkpatrick,* 649 F.Supp. 740 (N.D.Ind.1986). Given the reasoning and result in *McGill v. Duckworth,* 944 F.2d 344 (7th Cir.1991), *petition for cert. filed,* 60 U.S.L.W. 2217 (U.S. December 16, 1991) (No. 91–1119), it is impossible to rationalize a genuine issue of material fact under the concept of deliberate indifference. It is of no small moment that *Richardson v. Penfold,* 839 F.2d 392 (7th Cir.1988), is no longer the applicable standard in this circuit, given the specifics of the *McGill,* 944 F.2d at 344.

When it is all said and done, the Magistrate is correct. Judgment should be entered for the defendants. Each party will bear its own costs. The Clerk shall enter appropriate judgment.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

PIERCE, United States Magistrate Judge.

Plaintiffs William Leon Lile, Jr. and Andre J. LeBlanc filed this action pursuant to 42 U.S.C. § 1983, claiming that the defendants, which include the Tippecanoe County Jail (the "Jail"), Sheriff Dave Heath, and a number of jail officers or guards, violated their constitutional rights while they were pre-trial detainees, and later while they were convicted prisoners. This case is presently before the court on defendants' motion for summary judgment. For the reasons which follow, it is recommended that defendants' motion be granted.

### Background

Plaintiff Lile was incarcerated at the Jail following his arrest on November 9, 1988. He remained confined through the date of his conviction on August 21, 1989, until his transfer to the Indiana Department of Corrections' Reception and Diagnostic Center ("RDC") on November 16, 1989. Plaintiff LeBlanc's confinement at the Jail began on June 23, 1989. He remained in custody through the date of his conviction on October 19, 1989, until November 13, 1989, when he was transferred to the RDC.

Plaintiffs' complaint raises claims of alleged mistreatment by jail personnel and includes challenges to various conditions of confinement. More particularly, the complaint alleges that plaintiffs suffered "mental anguish" when another inmate who had been placed in their unit attempted suicide by biting through his wrist. According to the complaint, plaintiffs were splattered with blood during the suicide attempt, they were later "bribed" by jail personnel into cleaning up the inmates' cell with promises of extra coffee and tea rations, and their subsequent requests for AIDS testing were refused. The complaint further alleges that plaintiffs were forced to live in an "unhealthy atmosphere due to lack of sunlight," the absence of a drain cover in the shower in D–Cellblock, "no prevention of slippage in or out of the shower," overcrowded conditions in D–Cellblock and the rest of the Jail, lack of provisions for physical exercise, and unhealthy food handling. In addition, they allege that they were forced to inhale smoke "every day from people smoking," with a lack of ventilation and operable exhaust fans, and that on one occasion they had to remain in "deadlock," without ventilation, breathing smoke which resulted from a fire set by another inmate. Lastly, Mr. Lile alleges that he was deprived of proper medical care and treatment for nose polyps, and that his receipt of prescribed medication was delayed. The complaint seeks $250,000 in damages and asks that prisoners "be treated more humanely from now on."

### Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the initial responsibility of informing the court of the basis for the motion, and identifying "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). However, once a properly supported motion for summary judgment is made, the party that bears the burden of proof on a particular issue at trial cannot resist the motion by merely resting on its pleadings. *U.S. v. Lair*, 854 F.2d 233, 235 (7th Cir.1988). Rather, the party opposing the motion must "affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir. 1987). "A genuine issue for trial only exists when there is sufficient evidence favoring the nonmovant for a jury to return a verdict for that party." *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2553. "Summary judgment is properly entered in favor of a party when the opposing party is unable to make a showing sufficient to prove an essential element of a case on which the opposing party bears the burden of proof." *Common v. Williams*, 859 F.2d 467 (7th Cir.1988). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.1988). The inquiry involved in ruling on a motion for summary judgment implicates the substantive evidentiary standard of proof, for example, preponderance of the evidence, that would apply at trial. *Anderson*, 477 U.S. 251–53, 106 S.Ct. at 2512. All factual inferences must be drawn in favor of the non-moving party. *Valley Liquors*, 822 F.2d at 659. In this case, the court has considered the defendants' answers to the plaintiffs' interrogatories, together with the depositions of both plaintiffs taken in July, 1990.

### Standards of Liability Under § 1983

The plaintiffs' action is premised on 42 U.S.C. § 1983, which provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the Dis-

trict of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

In order for the plaintiffs to prevail on their claims under § 1983, they must establish that: " '(1) [they] held a constitutionally protected right; (2) [they were] deprived of this right in violation of the constitution; (3) the defendants intentionally caused this deprivation; and (4) the defendants acted under color of [state] law.' " *Patrick v. Jasper County*, 901 F.2d 561, 565 (7th Cir.1990), *quoting Donald v. Polk County*, 836 F.2d 376, 379 (7th Cir.1988). It is fundamental that in the absence of a violation of a federal right, there is no basis for liability under § 1983. *Clark v. Link*, 855 F.2d 156, 161–63 (4th Cir.1988); *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1349 (7th Cir. 1985) (". . . an alleged violation of a state statute does not give rise to a corresponding § 1983 violation, unless the right encompassed in the statute is guaranteed under the United States Constitution."). Moreover, as the Supreme Court has recently emphasized, "§ 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.' " *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), *quoting Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed.2d 433 (1979).

The complaint in this case does not specify which of the plaintiffs' constitutional rights were violated, but it is clear that the various claims relating to their treatment or mistreatment during the time they were pre-trial detainees are governed by principles of substantive due process under the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979). "[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Id.* at 535, 99 S.Ct. at 1872; *Salazar v. City of Chicago*, 940 F.2d 233, 239 (7th Cir.1991); *Anderson v. Gutschenritter*, 836 F.2d 346, 348 (7th Cir.1988). In analyzing the conditions of pre-trial detention, the court must bear in mind that

[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense, however. Once the government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial. Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain. Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.'

*Bell*, 441 U.S. at 537, 99 S.Ct. at 1873.

Relying upon *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), the Seventh Circuit, in *Shelby County Jail Inmates v. Westlake*, 798 F.2d 1085, 1094 (7th Cir.1986), held that the same "deliberate indifference" standard of liability under the Eighth Amendment applies to Fourteenth Amendment claims by pre-trial detainees, whether they are challenging the adequacy of medical care or the conditions of their confinement. Thus, in order for the plaintiffs to prevail, they must demonstrate more than mere negligence, or even gross negligence, on the part of the defendants. Rather, they must show that the defendants acted with deliberate indifference, manifested by either intentional or criminally reckless conduct. *Salazar*, 940 F.2d at 239; *Martin*, 845 F.2d at 1457; *Anderson*, 836 F.2d at 349; *Danese v. Asman*, 875 F.2d 1239, 1243 (6th Cir.1989), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990).

As previously noted, Mr. Lile was convicted on August 21, 1989, but remained in jail custody until his transfer to the RDC on November 16, 1989. Plaintiff LeBlanc was convicted on October 19, 1989, but remained in jail custody until his transfer to the RDC on November 13, 1989. Once an individual has been convicted of a criminal offense, either after trial or by plea, the Cruel and Unusual Punishments Clause of the Eighth Amendment, rather than the Fourteenth Amendment, becomes the controlling constitutional guarantee. *Berry v. City of Muskogee*, 900 F.2d 1489, 1493 (10th Cir.1990). In this case, certain of plaintiffs' claims arose after their respective dates of conviction. Thus, at the time of the suicide attempt by another inmate on September 28, 1989, Mr. Lile was a convicted prisoner, while Mr. LeBlanc was a pre-trial detainee. By the time of the fire in D–Cellblock on November 9, 1989, both plaintiffs were convicted prisoners. The evidence before the court does not disclose the specific dates when plaintiffs were held in various units of the Jail, and plaintiffs' claims regarding jail conditions, as well as Mr. Lile's medical treatment claim, appear to transcend their dates of conviction. Under prior law, it would have been necessary to analyze the issue of liability with respect to each claim by each plaintiff under the Fourteenth Amendment or the Cruel and Unusual Punishments Clause, depending upon whether the plaintiff had been convicted as of the time the claim arose. Although the constitutional protections afforded by the Fourteenth Amendment and the Eighth Amendment remain distinct (i.e. a prohibition upon "punishment," as opposed to a proscription against "cruel and unusual punishment"), the analysis of liability under § 1983 no longer requires a court to distinguish between pre-trial detainees and persons who have been convicted. The "deliberate indifference" standard of liability under § 1983 has been held applicable to individual and official capacity claims brought by pre-trial detainees as well as convicted prisoners. *See Brownell v. Figel*, 950 F.2d 1285, 1289–90 n. 5 (7th Cir. Dec. 17, 1991) ("Prohibited punishment has been held to include deliberate indifference to the serious medical needs of pre-trial detainees.");

*Salazar*, 940 F.2d at 237–41 (7th Cir.1991); *Holmes v. Sheahan*, 930 F.2d 1196, 1201 (7th Cir.1991) (pre-trial detainee must establish municipal policy or custom of deliberate indifference to impose liability upon county).

The plaintiffs here have sued the "Tippecanoe County Jail" and "Sheriff Dave Heath." Their claim against the Jail is actually a claim against the county, itself. Moreover, any claim against defendant Dave Heath in his capacity as Sheriff of Tippecanoe County, as well as any claims against the other defendants in their official capacities, likewise represent claims against the county. *Monell v. Department of Social Services*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978); *Hill v. Shelander*, 924 F.2d 1370, 1372 (7th Cir.1991); *Martin v. Tyson*, 845 F.2d 1451, 1455 (7th Cir.1988) (suit against county commissioners in their official capacities represented a claim against the county); *Dockerty–Bostron v. Waukesha County*, 744 F.Supp. 877, 881 (E.D.Wis.1990) (claims against county, county sheriff's department and jail personnel in their official capacities were actually claims against county).

In order to maintain a § 1983 claim against the Tippecanoe County Jail, Sheriff Dave Heath in his official capacity, or the other defendants in their official capacities, the plaintiffs must demonstrate that their constitutional rights were violated by some official policy or custom. *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037–38; *Springfield, Mass. v. Kibbe*, 480 U.S. 257, 267, 107 S.Ct. 1114, 1119, 94 L.Ed.2d 293 (1987); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986); *Kunik v. Racine County, Wisconsin*, 946 F.2d 1574, 1582–83 (7th Cir.1991) (affirming dismissal where complaint provided no basis for believing that allegedly illegal practices represented official policy, and where pleaded facts gave no reason to believe that alleged improprieties were more than a single occurrence); *Woods v. City of Michigan City, Ind.*, 940 F.2d 275, 277–78 (7th Cir. 1991); *Millspaugh v. County Dept. of Public Welfare*, 937 F.2d 1172, 1174 (7th Cir.1991) (affirming summary judgment for defendants where plaintiffs failed to identify any uncon-

stitutional policy and show how its application caused their injury); *Holmes,* 930 F.2d at 1200–1201 (district court erred in denying summary judgment for defendants where pre-trial detainee failed to present evidence of any county policy or custom which caused him to be denied medical care); *Hood v. City of Chicago,* 927 F.2d 312, 315 (7th Cir.1991) (affirming dismissal where complaint made only conclusory allegation of municipal policy or custom); *see also Soldal v. County of Cook,* 923 F.2d 1241, 1251 (7th Cir.1991).

■■■■■ To the extent that the plaintiffs have also sued Sheriff Dave Heath and defendants Grant, Balser, Ricks, Caldwell, Andrews, Dowell, Stump, Robbins and Hahn in their individual capacities, it must be noted that liability under § 1983, regardless of the particular constitutional theory, must be based upon personal responsibility. *Schultz v. Baumgart,* 738 F.2d 231, 238 (7th Cir. 1984). In *Wolf–Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983), the Seventh Circuit emphasized that "[s]ection 1983 creates a cause of action based upon personal liability and predicated upon fault. An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." (emphasis in original). *See Rascon v. Hardiman,* 803 F.2d 269, 273 (7th Cir.1986); *McBride v. Soos,* 679 F.2d 1223, 1227 (7th Cir.1982); *Adams v. Pate,* 445 F.2d 105, 107 (7th Cir. 1971). An official such as Sheriff Heath is considered to be personally involved if (a) he participates directly in the constitutional deprivation, (b) he acts or fails to act with reckless disregard of the plaintiffs' constitutional rights, or (c) the conduct that deprived the plaintiffs of their constitutional rights occurred at his direction or with his knowledge and consent. *Rascon,* 803 F.2d at 274; *Smith v. Rowe,* 761 F.2d 360, 269 (7th Cir. 1985); *Crowder v. Lash,* 687 F.2d 996, 1005 (7th Cir.1982). "[I]t is not sufficient for a section 1983 plaintiff to show that a supervisory official was remiss in supervising the implementation of policy in force in an institution. Rather, to establish a claim against a supervisory official, there must be a showing that the official knowingly, willfully, or at least recklessly caused the alleged depriva-tion by his action or failure to act." *Rascon,* 803 F.2d at 273–74.

### Suicide Attempt by Fellow Inmate

■■■■ The complaint refers to an incident on the afternoon of September 28, 1989, when defendants Dowell, Baker and Stump asked the plaintiffs to watch another inmate, Scott Chapman, who had allegedly been brought to the Jail "because of psychotic reasons." According to the complaint, Chapman soon began to bite through his wrist and proceeded to drip or splatter large amounts of blood throughout his cell, as well as on Lile and LeBlanc as they passed by his cell in order to call for help. The complaint alleges that the plaintiffs were subsequently "bribed into cleaning up mess" for a week's extra coffee and tea. Later that day, Lile and LeBlanc allegedly asked defendant Stump for an AIDS test but supposedly never received "a straight answer." On the morning of September 29, according to the complaint, defendants Caldwell and Andrews returned Chapman to his cell and the "same thing happened." Chapman was again removed from his cell, but on this occasion defendants Caldwell and Andrews "cleaned it up." When Lile and LeBlanc asked Caldwell for an AIDS test, Caldwell allegedly responded, "oh you don't need one I've gotten splattered by him before," but then admitted he had received an AIDS test. Lile alleges that he was unable to sleep "very well for a few nights" after the incident, and both Lile and LeBlanc allege that the incident caused them mental anguish.

It is doubtful that these allegations, taken as true, would even state a claim against any of the defendants under the prevailing standard of deliberate indifference. In any event, the plaintiffs have come forward with no evidence in response to defendants' motion for summary judgment, suggesting that the defendants' actions were intended to punish them or that their conduct toward plaintiffs amounted to criminal recklessness. Ultimately, it is apparent that plaintiffs have suffered no constitutional violation. Accordingly, defendants are entitled to summary judgment on plaintiffs' claim regarding the suicide attempt by another inmate.

*Jail Conditions*

█ The complaint alleges that plaintiffs were forced to live in an "unhealthy atmosphere" as the result of overcrowded conditions in D–Cellblock and the rest of the Jail, "no prevention of slippage in or out of shower," lack of provisions for physical exercise, and the presence of cigarette smoke combined with a lack of ventilation. The evidence, however, fails to demonstrate that any of these conditions, either alone or in combination, were the result of deliberate indifference on the part of any of the named defendants, or a policy or custom designed to punish pre-trial detainees. *See e.g. Martin,* 845 F.2d at 1455.

According to Mr. Lile's deposition testimony, the Jail contained five separate housing units consisting of one area on the north side of the Jail (referred to by plaintiffs as "the north side") and cellblocks designated A through D. A–Cellblock contained 2 two-man cells, 1 one-man cell, and an eating area. According to Mr. Lile, a maximum of seven and a minimum of four inmates were housed on A–Cellblock, and the unit housed only four inmates during the one-month period when he was housed there (Lile dep. pp. 25–26). B–Cellblock contained 3 two-man cells. During the month Mr. Lile spent in that unit, the inmate population remained at six (Lile dep. p. 27). C–Cellblock, which contained 3 two-man cells and an eating area, was used to temporarily house inmates upon their arrival at the Jail and before their assignment to a cellblock. As Mr. Lile testified, "[i]t was like where people first come in. I mean there would be a guy in there, he will leave one minute later to go to a cellblock.... It was like R.D.C. [apparently referring to the Indiana Department of Correction's Reception and Diagnostic Center] when you first come in, they put you in there if they don't know about you, and they check you out, see where you should be." According to Mr. Lile, C–Cellblock was "always full," and at one time it contained at least 16 inmates. Mr. Lile was told by guards that on one occasion "they had them sleeping in the shower stalls it was so packed" (Lile dep., p. 26). Mr. Lile spent at least 6 months in D–Cellblock, which contained 1 two-man cell, 3

one-man cells and a shower area. For the most part, the unit housed five inmates, but during one period in the summer of 1989 it housed eight and possibly nine inmates. According to Mr. Lile, this was due to the fact that the RDC, which was under a federal court order limiting its inmate population, "was making the jails hold people there because they couldn't hold them in R.D.C." (Lile dep., p. 24). Mr. Lile testified that he spent one or two months on the north side following his arrival at the Jail. The north side contained a day room, drunk tank, shower and ten cells. The cells consisted of 7 two-man cells, 2 one-man cells and 1 four-man cell. The north side population varied between a maximum of 34 and a minimum of 16 inmates (Lile dep., pp. 19–21). During the time Mr. Lile was housed on the north side, the unit contained approximately 20 inmates, not including those being held in the drunk tank. A typical cell measured approximately 8 by 10 feet, contained two bunks, a gray-painted toilet, a steel mirror, a florescent light, "dingy" walls, and a gray-painted floor (Lile dep., p. 19).

In his deposition, Mr. LeBlanc testified that when he first arrived at the Jail, he was placed on the south side. At the time, the south side unit housed approximately 25 inmates (LeBlanc dep., p. 22). He was subsequently moved to D–Cellblock, where he shared the only two-man cell with another inmate. Accordingly to LeBlanc, the inmate population in D–Cellblock was usually 8, but could increase on weekends to possibly 12 or 13 inmates "because they brought in public intoxicated people." Mr. LeBlanc testified that

[t]hey brought those people over and put them in our cell. A couple of them were one-man cells and they had two people in it, one sleeping on the floor and one sleeping on the bed. There was one two-man cell, which I was in. They had two people in there, and sometimes they had a person on the floor in each cell down the range, so it fluctuated there for a while. They had eight to twelve or eight to thirteen people.

(LeBlanc dep., p. 24).

According to Mr. Lile, "the ventilation in D block was broke. It wasn't running." (Lile

dep., p. 35). Lile wrote letters to Sheriff Heath and Lt. Grant, apparently complaining about the presence of smoke in D–Cellblock. On one occasion, Lt. Grant told Lile: "I know how bad the smoke is back here, but the fans are broke." Lt. Grant, as well as defendants Hahn and Andrews, also advised Lile that, according to the Sheriff, the windows could not be opened because most of the inmates had been yelling to passers by (Lile dep., p. 35). Mr. Lile also testified that the ventilation system in the north side unit was working, but "wasn't really working good enough to carry the smoke out because of the amount of people in such a small area." Mr. Lile acknowledged, however, that Jail personnel did make attempts to reduce the ventilation problem in the north side unit by turning on the fans and by operating the air conditioning system in the summer (Lile dep., p. 36). Mr. Lile further indicated that he always received responses to his complaints even if they were "negative, good, bad, or otherwise." (Lile dep., p. 37).

Mr. LeBlanc also testified that there was a big hole in the floor of the shower room, that the shower curtain was ripped, and that "water was always out in the walkway where people walked to get our food and stuff." LeBlanc indicated that the showers were located adjacent to an opening in the bars where food trays would be inserted and that "some people would take showers and splash their soap and everything all over the bars." He further stated that the shower was "always dirty," and that there was no cover for the drain. He recalled that on one occasion an inmate had stepped in the drain hole in the floor of the shower and "scraped up his leg." Mr. LeBlanc also testified: "I banged my toe in there a couple of times but I was always quick enough to catch myself." (LeBlanc dep., pp. 30–31).

■■■ Plaintiffs' memorandum filed on April 18, 1990 refers to an incident in which Mr. Lile found a pubic hair in his food, and states that supposedly when he asked jailor Jack Hahn if he could get another tray, Hahn replied "either eat that tray or don't eat." These statements, however, are unsworn and contain inadmissable hearsay. Consequently, they cannot be considered by the court in ruling on defendants' motion for summary judgment. See Randle v. LaSalle Telecommunications, Inc., 876 F.2d 563, 570 n. 4 (7th Cir.1989). In any event, the fact that food may occasionally contain foreign objects does not suggest a constitutional violation, and a refusal by jail personnel to provide an inmate with a new tray of food does not disclose an intent to inflict punishment or deliberate indifference to the inmates' health or safety.

■■■ The evidence submitted by plaintiffs in opposition to defendants' motion for summary judgment fails to demonstrate that the Jail was subject to unconstitutional overcrowding during the period of their incarceration, or that any of the conditions of their confinement at the Jail, either alone or in combination, amounted to "punishment." Moreover, plaintiffs have not come forward with evidence demonstrating an intent to punish on the part of any of the individual defendants, or such a custom or policy established by Tippecanoe County. Although plaintiffs have shown that the inmate population in certain detention units sometimes exceeded the capacity of the units, there is no evidence as to the overall capacity of the Jail, no indication that either of the plaintiffs were forced to sleep on the floor, and no evidence that the occasional excess inmate population in certain units left them with inadequate living space or otherwise adversely affected their health or safety, recreation or exercise opportunities. While plaintiffs have also indicated that ventilation in the north side unit and D–Cellhouse was poor, they have offered no competent medical evidence suggesting that the reduced ventilation and the presence of cigarette smoke in those units had any adverse impact upon their health. Cf. Steading v. Thompson, 941 F.2d 498 (7th Cir.1991) (asthmatic prisoner failed to state Eighth Amendment claim based on alleged failure of prison authorities to provide him with environment free of cigarette smoke produced by guards and fellow inmates); Mitran v. County of Du Page, Illinois, No. 89 C 5702, slip op., 1990 WL 207451 (N.D.Ill. Dec. 11, 1990) (1990 U.S. Dist. LEXIS 16806). Ultimately, plaintiffs have produced no evidence indicating that they were deprived of adequate living space, light, heat, food, water, exercise or

recreation, and they have failed to come forward with evidence showing that conditions in the jail constituted a health hazard. In essence, plaintiffs have offered no proof that the physical conditions of the Tippecanoe County Jail were either inadequate or harmful under constitutional standards. *See Martin,* 845 F.2d at 1457.

### Medical Treatment

■ Mr. LeBlanc testified in his deposition that he had no claim with regard to medical treatment or lack of medical treatment (LeBlanc dep., p. 34). Only Mr. Lile is pursuing a claim based upon an alleged lack of adequate or proper medical care and, of the several named defendants, the evidence implicates only Sheriff Heath in the alleged denial of treatment.

In his deposition, Mr. Lile testified that he began to experience problems with "bad polyps" in his nose during the time he was incarcerated at the Jail; that he was seen by Dr. Carpenter (apparently the Jail's physician) on a number of occasions; and that he was told by Dr. Trout, an Ear, Nose and Throat Specialist, that he needed to have his polyps "cut down." Mr. Lile stated that he was later informed by Dr. Carpenter that the Sheriff had "said they would not pay for the surgery when I was in jail," but indicated that he "was getting ready to be put in prison at the time." When his deposition was taken on July 17, 1990, Mr. Lile reported that the polyps were not so bad and that they could be "taken care of with a small type of surgery." (Lile dep., p. 42). He added that he had been told approximately two weeks prior to the deposition that the surgery "was going to be within six weeks." He was unable to say whether his nose polyps had anything to do with his incarceration at the Jail, but believed that his inhalation of secondary cigarette smoke had resulted in a "breathing disorder" (Lile dep., p. 43). According to his deposition testimony, Mr. Lile was seen by the "E.N.T. doctor" following his arrival at the Westville Correctional Center, and was advised "that by not doing the polyps that it helped get the sinus tracts infected because the stuff would not drain." Lile further testified: "I was blowing my nose

and things and a little bit would even come out of my eye sacks where my tear sacks are supposed to be. He stated that, according to the E.N.T. specialist who had been treating him, it went on way too far." (Lile dep., p. 43).

■ It is apparent that Mr. Lile has failed to demonstrate the existence of a triable issue of fact on his medical treatment claim. His deposition testimony shows that he was seen and examined on a number of occasions by the Jail's physician, Dr. Carpenter, as well as Dr. Trout, an Ear, Nose and Throat Specialist. There is no evidence that any of the defendants ever prevented him from being seen by a physician or receiving prescribed medication, or that any of the defendants were ever made aware of his "breathing disorder." Although Mr. Lile testified that the Sheriff refused to authorize the surgery which had been recommended by Dr. Trout, the evidence gives no indication, apart from Mr. Lile's statement that he was "getting ready to be put in prison," as to the time interval between that refusal and his subsequent transfer to the custody of the Indiana Department of Corrections. It is entirely possible that the surgery could not have been scheduled within the time he had left at the Jail and, absent some indication that the proposed surgery was a matter of urgency, or some reason to suspect that the condition was serious, the Sheriff's refusal to have the county pay for it cannot be characterized as a deliberate effort to "punish" Lile. Lastly, there is nothing to suggest that Mr. Lile's nasal condition amounted to a "serious medical need," *see e.g. Williams–El v. Johnson,* 872 F.2d 224 (8th Cir.1989) (cut lip held not serious), and Mr. Lile has produced no proof of any policy or custom of the county designed or intended to deprive him of adequate medical care.

### Fire in D–Cellblock

■ The evidence of record shows that on November 9, 1989, Lile and LeBlanc were among six inmates housed in D–Cellblock. At about 9:45 p.m. on that date, as Lile and LeBlanc were playing dominos in one of the cells, another inmate started a paper fire in the unit. According to Lile, the "smolder-

ing" fire produced considerable smoke, but the jailers, including Bill Balser, Brett Stump, Gary Dowell and Lt. Anderson, were able to put the fire out with fire extinguishers. Mr. Lile testified that the inmates in the unit were initially placed in "deadlock" for approximately 40 minutes. During that time the inmates were unable to reach the air conditioner to turn it on. The jailers would not allow the windows in the unit to be opened and, according to Lile, the "vents weren't fixed yet." (Lile dep., p. 38). Lile testified that throughout this time the inmates in the unit were forced to breathe the smoke. After being released from deadlock, Lile asked Lt. Anderson about opening the windows and turning on the ventilation. In response, Anderson supposedly told Lile, "well, just breathe the smoke out of the air." Later, as Lile was walking up and down the catwalk, he apparently passed out but was revived by other inmates who also summoned the jailers. After finding that Lile's pulse was racing, the inmates told him that he was hyperventilating. Mr. Lile testified that "they got me some wet rags, put it on me for a minute, and slowly had me sit up until I started getting a little wind back, and they took me back to my bed, had me lay down there for the rest of the evening." He believed that he passed out because of the fire. According to Lile's testimony, Lt. Anderson later remarked that "[i]t was probably from all the smoke he was breathing in." Lile testified that Anderson "was getting smartassed, you know, and that's why he said that." (Lile dep., pp. 39–40).

Again, the court must conclude that the evidence fails to demonstrate a triable issue of fact. First, there is no evidence that defendants Grant, Ricks, Caldwell, Andrews, Robbins, Hahn or Heath were present or aware of the fire. Because the evidence fails to show that any of those defendants were personally involved in the fire incident, they are clearly entitled to judgment as a matter of law on this issue. Second, Plaintiff LeBlanc has produced no medical evidence suggesting that he suffered any injury resulting from the fire or the presence of smoke in the unit. Third, the evidence shows that defendants Balser, Stump, Dowell and Anderson responded to and extinguished the

fire which had been set by an inmate. Fourth, while the evidence indicates that Lt. Anderson refused Lile's request to open the windows on the unit and supposedly told Lile to breathe the smoke out of the air, there is no indication as to the length of time the smoke was present, that any of the other inmates complained about the presence of the smoke, or that any of the other inmates suffered any discomfort or injury from the smoke. From all that has been shown, the jailers, including Lt. Anderson, endured the smoke along with the inmates. Fifth, while Mr. Lile indicates that he passed out, there is no competent medical opinion indicating that he did so as the result of smoke inhalation. Mr. Lile's deposition testimony suggests that he briefly lost consciousness and was revived by other inmates who told him that he was hyperventilating. Beyond this, there is nothing to indicate that he suffered anything more than temporary discomfort during the incident, and the evidence falls far short of suggesting that Lt. Anderson intended to punish Lile by refusing to open windows in the unit.

For the foregoing reasons, it is **RECOMMENDED** that the defendants' motion for summary judgment be **GRANTED.**

**ANY OBJECTIONS** to this report and recommendation must be filed with the Clerk of courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. See *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Lockert v. Faulkner,* 843 F.2d 1015 (7th Cir.1988); *Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538 (7th Cir.1986).

Dated this 7th day of January, 1992.